**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOANNE CICINO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No.** |
| | ) | |
| **TRUMARK FINANCIAL CREDIT UNION,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Defendant.** | ) | |
| | ) | |
| | ) | |
| | ) | |

**COMPLAINT**

Plaintiff Joanne Cicino ("Cicino"), by her undersigned attorneys, hereby brings the following Complaint against Defendant TruMark Financial Credit Union ("TruMark") and alleges as follows:

## I. INTRODUCTION

1. This dispute arises from TruMark's discrimination against Cicino in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. § 621 ("ADEA"), and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951, *et seq*. (the "PHRA").

2. Cicino, 63 years old, was a highly successful commercial loan officer for decades until being terminated, without any notice or severance, on April 14, 2025.

3. In fact, Cicino's previous supervisor at TruMark, Richard Stewart ("Stewart"), had given Cicino a glowing Performance Appraisal in 2023, rating her "Exceeds Expectations" in 4 of 5 categories.

4. Everything changed, however, when Daniel Krewson ("Krewson") took over as TruMark's director of commercial loan origination and became Cicino's supervisor.

5. Krewson tried to drive Cicino from the company by stripping her of branches near her home at the time in Malvern, Pennsylvania.

6. Prior to Krewson becoming her supervisor, Cicino was assigned to eight Pennsylvania branches located in Phoenixville, West Chester, Downingtown, Malvern, Gateway/Paoli, Springfield, Fort Washington, and Plymouth Meeting.

7. Cicino had very good relationships with the managers in these branches.

8. After Krewson took over as her supervisor, TruMark assigned Cicino to two branches in Northeast Philadelphia, located at 1900 North Fifth Street and 7350 Large Street, while simultaneously taking away Cicino's Phoenixville, Downingtown, Springfield, Ft. Washington, and Plymouth Meeting branches where Cicino had worked hard to establish strong relationships with the branch managers.

9. One or more of Cicino's younger male colleagues lived much closer to these Northeast Philadelphia branches.

10. Cicino also advised Krewson she had turned down another opportunity because she would have had to commute into Philadelphia just one day a week.

11. Nevertheless, even though one of Cicino's younger male colleagues lived in Philadelphia and another drove through Philadelphia on his way to work, TruMark assigned these two Northeast Philadelphia branches to Cicino.

12. In his position as Cicino 's supervisor, Krewson also consistently referred deals to Cicino's male counterparts, all of whom are younger than Cicino.

13. Krewson referred Ed Hepworth ("Hepworth"), a TruMark employee who, upon information and belief, was in his 30s, close to 10X the amount of loans he referred to Cicino.

14. These referrals to Hepworth included an opportunity which led to more in commissions for Hepworth than all the loans combined that Krewson referred Cicino.

15. In the 2024 Performance Appraisal, Krewson then rated Cicino "Did Not Meet Expectations" in the majority of categories.

16. In this same 2024 Performance Appraisal, Krewson levelled a series of allegations against Cicino which are both false and cannot be reconciled with the 2023 Performance Appraisal Cicino received from her previous supervisor only a year earlier.

17. Krewson flaunted and reveled in his discriminatory conduct.

18. Krewson took Cicino's younger male colleagues to lunch but did not do the same for Cicino.

19. Krewson bought Cicino's younger male colleagues Starbucks coffee, while never doing the same for her.

20. Krewson invited Cicino's younger male colleagues – never Cicino – to his office to smoke and to joke behind closed doors.

21. Krewson delayed approving PTO requests for Cicino while quickly approving comparable requests for her younger male colleagues.

22. Once, Krewson was looking for one of Cicino's younger male colleagues and saw that Cicino and another younger male, Brad Barone ("Barone"), were the only ones there.

23. Krewson remarked "Oh Brad, I didn't see you come in" but proceeded to say "I knew Cicino was here because I could smell her perfume."

24. Krewson made sexist comments about Cicino multiple times.

25. On another occasion, when Cicino wore a pink Talbots jacket, Krewson commented that she looked like a "Main Line Mom."

26. Krewson made Cicino acutely aware that, as an older woman, she would be treated less favorably than her younger male colleagues.

27. Krewson set up a golf putting area, a basketball hoop, and football pools geared for the younger males only.

28. The discrimination Cicino suffered was so acute and pervasive that her TruMark male co-workers even commented on it.

29. Desperate for answers as to why Krewson was targeting her, Cicino contacted one of his former colleagues who told Cicino words to the effect "beware, he [Krewson] doesn't play nice with women" and that Krewson "has women issues."

30. In addition, Cicino complained to Stewart, her former supervisor and a part of TruMark management, on multiple occasions.

31. Stewart told Cicino she needed to "hitch her wagon" to Krewson and that he would speak with Krewson on her behalf.

32. Upon information and belief, Stewart did speak with Krewson about the fact that Cicino believed she was being treated unfairly.

33. Krewson's treatment of Cicino did not improve.

34. Despite stating in her 2024 Performance Appraisal that "it will be recommended for FY25 Jo [Cicino] be a party to a performance improvement plan," a full three months later Trumark then suddenly fired Cicino without any notice (or severance) and without ever placing her on a PIP.

35. Upon information and belief, TruMark's HR Department was not consulted before Cicino's firing.

36. No one from TruMark's HR Department was present for Cicino's firing.

37. Shortly after being fired, Cicino advised Sweta Nazareth ("Nazareth") and Suzanne Scullion ("Scullion"), two TruMark HR officials, that she had been dealing with an abusive and toxic workplace under Krewson's management.

38. Cicino further advised them Krewson had made her life a "living hell" by creating a hostile work environment.

39. Neither Nazareth nor Scullion said anything in response.

40. Neither Nazareth nor Scullion ever followed up with Cicino to investigate her concerns.

41. Upon information and belief, TruMark's HR Department did nothing to investigate Cicino's allegations of an abusive and toxic workplace.

42. Had Cicino been one of the younger male counterparts this never would have happened.

43. Just the opposite, Trumark also turned a "blind eye" to conduct committed by Cicino's younger male colleagues that not only contravened TruMark policy but may be illegal.

44. For example, there was supposed to be a "Wall" between one of the younger male commercial lenders, Brian Fox ("Fox"), and his wife who is a Credit Administration Manager for TruMark.

45. In her role, Ms. Fox reviewed credit and had significant influence in determining which loans were passed to the next level.

46. Upon information and belief, Fox spoke regularly with his wife on how to get deals approved at TruMark.

47. To the extent Fox spoke with his wife on how to get deals approved at TruMark, it would violate company policy.

48. Upon information and belief, to the extent Fox spoke with his wife on how to get deals approved at TruMark, it would violate banking regulations.

49. Cicino heard Fox talking regularly with his wife on how to get deals approved, a clear conflict of interest.

50. Upon information and belief, Krewson and/or others at TruMark had knowledge of the fact that Fox spoke with his wife on how to get deals approved at TruMark.

51. With TruMark's and Krewson's knowledge and blessing, Ms. Fox also was very involved with helping Cicino's younger male colleagues while not doing anything to assist Cicino.

52. Specifically, Ms. Fox was responsible as well for preparing the agenda for the DDM (Deal Discussion Memo) meetings required for all loan requests over $1 million and could influence which of these loan requests – all with the potential to generate substantial commissions – are reviewed.

53. On more than one occasion, for Cicino's younger male colleagues, Ms. Fox got "special" meetings outside the very strict "Thursday at 4pm" meeting time.

54. But Krewson severely admonished Cicino multiple times when she sought this same flexibility from Ms. Fox and did so very publicly so as to humiliate Cicino in front of her peers.

55. Under Krewson's stewardship, TruMark's commercial loan unit became the ultimate "Boy's Club."

56. In fact, since firing Cicino, TruMark and Krewson have hired two new employees (Nick Saenz and Johnny Gonzalez) onto the team – both of whom are men and, upon information and belief, considerably younger than Cicino. Upon information and belief, during this same period, TruMark and Krewson have not hired any older women into the commercial loan unit.

57. TruMark – through its discriminatory actions – destroyed Cicino's decades-long career in the commercial lending arena and caused Cicino to suffer immense financial, emotional, and other damage.

## II. PARTIES

58. Cicino is a citizen of the Commonwealth of Pennsylvania.

59. TruMark is a Pennsylvania-based credit union headquartered in Pennsylvania.

## III. JURISDICTION AND VENUE

60. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and jurisdiction over the federal employment claims under 42 U.S.C. § 2000e-5(f)(3) and 29 U.S.C. § 626(c). Supplemental jurisdiction exists over the PHRA claims under 28 U.S.C. § 1367.

61. Venue is proper in this District under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), because TruMark conducts business in and is headquartered in this District, Cicino resides in and worked for TruMark in this District, and substantial events giving rise to Cicino's claims occurred in this District.

62. Cicino filed EEOC Charge No. 530-2025-08290, asserting *inter alia* sex discrimination, age discrimination, and PHRA violations and requesting dual filing with the Philadelphia Human Relations Committee.

63. On September 2, 2026, the EEOC issued a "right to sue" letter. (Ex. A).

## IV. FACTS COMMON TO ALL COUNTS

### A) Cicino Was a Highly Successful Commercial Loan Officer for Many Years

64. For many years prior to her firing, Cicino had been a highly successful commercial loan officer.

65. Cicino began her career in commercial lending in the mid-1980s.

66. For approximately 15 years, Cicino ran a desk where she supervised other commercial loan officers and personally booked many loans herself.

67. After taking a break to raise her young children and act as the primary caretaker for her parents for approximately seven years, Cicino continued her career, including at Centric Bank which was later rebranded as First Commonwealth Bank.

68. At Centric/First Commonwealth, Cicino had stints both as a Portfolio Manager and an Assistant Branch Manager.

### B) Cicino Received an Excellent 2023 Review from her Prior TruMark Supervisor

69. In late 2023, Cicino received her Performance Appraisal for 2023.

70. In the Knowledge/Skill Rating category, Cicino's previous supervisor (Stewart) wrote: "Joanne has a solid understanding of the commercial loan policy and the overall commercial loan process. Joanne's previous experiences in finance have been a great compliment to her role as a loan officer." (Ex. B at p. 1).

71. Giving Cicino an "Exceeds Expectations" rating of 6, Stewart further noted:

"Joanne is able to advise members as to the right loan structure to meet their borrowing needs." (*Id.*).

72. Stewart similarly rated Cicino "Exceeds Expectations" on "Quality" and gave her an even higher rating of 7, stating: "Joanne is very detailed in her work and thorough in collecting the correct information so a lending decision can be made quickly on a loan request. This detail and attention to her work creates the ability for loan decisions to be made quickly and translates to a satisfied borrower." (*Id.*).

73. Stewart likewise gave Cicino high praise for her "Teamwork" and "Service."

74. Among other things, Stewart complimented Cicino on providing "excellent service to the members she is working on for commercial loans."

75. Stewart noted that Cicino "is always willing to help out those on the commercial lending team as well as those in other departments." (*Id.* at p. 2).

76. Yet again, Cicino "Exceed[ed] Expectations" and scored a 7. (*Id.*).

77. In the Fall of 2023 Stewart and Stewart's supervisor, Steven Olson ("Olson"), also hand-selected Cicino to handle a customer who had the potential to be a very large relationship.

78. Cicino grew it to be the largest relationship for TruMark at the time.

79. Stewart and Olson sent Cicino numerous emails complimenting her performance.

80. Stewart concluded his 2023 Performance Appraisal for Cicino by saying: "Based on Joanne's current loan pipeline, she is well positioned to have a very successful 2024." (*Id.* at p. 3).

81. Cicino had a very successful start to 2024.

82. Cicino closed nearly $5 million in deals in Q1/2024.

83. Upon information and belief, this was the second highest of all the TruMark commercial lenders for Q1/2024.

84. Instead of having a "very successful 2024," however, Cicino became the victim of TruMark's discrimination which resulted in her sudden firing. .

**C) Krewson Tries to Drive Cicino from the Company by Stripping Her Branches**

85. From the moment Krewson became her supervisor, Cicino had a target on her back.

86. Initially, even though Cicino lived in Malvern at the time, TruMark (at Krewson's direction and/or with his input) assigned her to two Northeast Philadelphia branches.

87. Both these Northeast Philadelphia branches were approximately 35 miles from Cicino's home.

88. Branch assignment was department-driven.

89. Upon information and belief, either Krewson or another TruMark representative (Jack Eckert) spoke with every other commercial lender and Business Relationship Management except Cicino about which branches they would prefer.

90. Krewson knew from a prior discussion with Cicino that she did not want to work in Philadelphia.

91. Krewson knew from a prior discussion with Cicino that she had turned down an offer with another firm because it would have required working in Philadelphia just one day a week.

92. Following reassignment of the Northeast Philadelphia branches to her, Cicino was required and/or expected to travel to these branches more than one day per week.

93. A male commercial lender who is younger than Cicino lived in New Jersey and

drove through Philadelphia on his way to work.

94. Another male commercial lender, also younger than Cicino, lived in Philadelphia at the time.

95. At least two other male commercial lenders – again younger than Cicino – also lived much closer to Philadelphia than Cicino.

96. In addition to being very far away from her home, the two Philadelphia branches TruMark assigned Cicino generated less commercial loan business than Cicino's prior branches.

97. Upon information and belief, Krewson knew these Philadelphia branches generated little (if any) commercial loan business.

98. TruMark and Krewson simultaneously stripped Cicino of suburban branches where she had very good relationships.

99. TruMark's and Krewson's strategy was to make it as painful as possible for Cicino in the hopes she would leave the company

**D) TruMark and Krewson Deprive Cicino of any Meaningful Referrals**

100. When Cicino did not choose to resign from TruMark, Krewson attempted to "starve her out" by referring all significant deals to the younger male commercial lenders.

101. While referring Cicino what they called DV referrals, which have a low chance of closing and are typically small deals, TruMark and Krewson steered the more lucrative commercial loan referrals to Cicino's younger male colleagues,

102. In 2024, Krewson referred commercial loan deals worth approximately $35 million to himself.

103. This represented about 7 times the amount in terms of commercial loan deals that Krewson referred to Cicino.

104. Krewson referred Hepworth, a male commercial loan officer in his 30s, commercial loan deals worth 10 times those he referred to Cicino.

105. Moreover, of the very few so-called “referrals” TruMark and Krewson made to Cicino, many were not even viable.

106. Krewson remarked to Cicino about one deal that he was “not surprised” the borrower was not approved but it “kept you [Cicino] busy.”

107. Krewson admitted to Cicino he knew another referral never would be approved.

108. Cicino worked diligently on this potential deal when, instead, her valuable time could have been spent on deals that had a chance of closing.

**E) Krewson Provided No Support to Cicino and Stole or Sabotaged Her Deals**

109. Krewson also lent great assistance to the younger males in closing loans, such as attending meetings or participating in calls with prospective borrowers, but did nothing to help Cicino.

110. In August 2024, Cicino sent Krewson an email asking that he participate on a conference call with a borrower for a nearly $3 million deal.

111. Krewson refused and the deal never closed.

112. Cicino repeatedly sent Krewson emails saying words to the effect “when might you be able to discuss” or “please call me when you can” to no avail.

113. This continued and until virtually the end of her employment with TruMark.

114. In the Fall of 2024, Cicino worked diligently on another deal, including participating in phone calls and remote meetings both while her son was in the hospital with a perforated esophagus and then later while on vacation.

115. But her attempts to get Krewson’s assistance were rebuffed.

116. In a November 2024 email, Krewson said he did not have time – something he would not have said to Cicino's younger male colleagues.

117. In 2024-2025, construction loans also were becoming an increasingly lucrative area of business for TruMark.

118. Krewson spent considerable time working with Cicino's younger male co-workers on how to close construction loans but never did the same for Cicino.

119. In December 2024, Cicino provided Krewson with a detailed summary of all her activities but received no response.

120. In late January 2025, Cicino tried to get Krewson's attention, opinion, and guidance for a large $11 million loan.

121. Cicino then sent Krewson an email on January 26, 2025 asking for a status update on this same large loan but never received any.

122. Doing everything in his power to get rid of Cicino, Krewson "slow walked" deals she was working on as well.

123. Krewson insisted on seeing a write-up on Cicino's prospective deals at each stage as they moved through the process which, upon information and belief, he did not require of Cicino's younger male colleagues.

124. Krewson then invariably placed Cicino's write-ups at the bottom of the pile, in addition to holding her write-ups to a much more difficult standard, while fast-tracking the deals being worked on by her younger male colleagues – deals that Krewson largely had referred to them and not to Cicino.

125. With TruMark's and Krewson's knowledge and blessing, Ms. Fox also was very involved with helping Cicino's younger male colleagues while never lifting a finger for Cicino.

126. For instance, Krewson helped the younger male commercial lenders, such as Barone, write up analyses to get deals approved to the point where Barone openly bragged about it.

127. Krewson did nothing to help Cicino on writing analyses for any of her deals to be approved.

128. At the end of 2024, Krewson then had an "annual review meeting."

129. Upon information and belief, Cicino was the only commercial loan officer not provided with a copy of the annual review to read in advance of the meeting and Krewson gave all of Cicino's younger male colleagues that opportunity.

130. Krewson then showed up late for Cicino's annual review.

131. Krewson also told Cicino he was in a rush because he was "having a party with over 100 people at his home that evening."

132. In addition, Krewson stole and/or sabotaged deals Cicino had sourced herself.

133. Krewson contacted one of Cicino's customers without her being on the email.

134. Krewson then had a conversation with the same customer without alerting Cicino in advance.

135. Krewson proceeded to reject Cicino's request for a joint communication between the three of them.

136. Upon information and belief, TruMark and Krewson did not engage in similar conduct with respect to Cicino's younger male colleagues.

137. This particular deal Cicino was working on did not come to fruition either.

138. In late 2023/early 2024, a customer with whom Cicino had worked previously decided to sell half his business to a high-net worth individual who is very well-connected in the

Philadelphia area.

139. This led to a new loan request which Cicino worked on and got approved.

140. The deal was set to close in early March 2024 at which time Cicino would have met the new 50% owner who would be a source of future business.

141. While Cicino was on PTO from February 26-March 1, 2024, however, Krewson arranged for the deal to close and had a younger male commercial loan officer finalize it.

142. As a result, Cicino lost out on the opportunity to meet a highly successful local businessman who could have been a source for even more business for her in the future.

143. Cicino tried to at least salvage the relationship for herself going forward but TruMark and Krewson again stood in the way.

144. After cutting Cicino out of the closing, Krewson failed to get back to Cicino on dates that would work on his calendar for a lunch with this local businessman.

145. Krewson eventually told Cicino he "missed the memo" from her asking about his availability for lunch

146. Krewson further sabotaged Cicino's prospective deals by failing to take steps to have TruMark offer competitive terms.

147. Cicino alleges upon information and belief that TruMark treated her far worse in this respect than her younger male colleagues.

148. By way of example, in March – April 2025, Cicino was working on a potential deal with three new and well-connected Philadelphia based borrowers.

149. When Cicino was on the verge of securing the loan, another institution offered the customer a better rate.

150. Upon information and belief, Krewson would have worked to obtain a matching

rate for one of the younger male commercial loan officers.

151. Krewson did not attempt to obtain a matching rate for Cicino.

152. It was obvious even to other TruMark employees that Cicino was being discriminated against.

153. Ron Langlois ("Langlois") was Head of Credit at the time for TruMark.

154. Langlois remarked to Cicino on multiple occasions about how she was been treated less favorably and judged more harshly than her younger male colleagues.

155. Trupert Ortlieb ("Ortlieb") was a Portfolio Manager who worked with Krewson at Huntingdon Valley Bank before they joined TruMark.

156. Ortlieb told Cicino how unfairly she was being treated, consistently telling Cicino "no one is swinging the bat harder than you."

157. TruMark's and Krewson's refusal to provide any support to Cicino, and interference with the deals she sourced herself, were part of a broader effort by TruMark and Krewson to drive Cicino from the company.

158. TruMark and Krewson sought to get rid of Cicino, either voluntarily or involuntarily.

159. TruMark and Krewson discriminated against Cicino in order to accomplish this goal.

**F) Krewson Makes Outright Fabrications in Cicino's 2024 Performance Appraisal**

160. To ensure TruMark could fire Cicino, Krewson also resorted to unfairly and inaccurately denigrating Cicino in her review.

161. Krewson – in his capacity as Trumark's director of commercial loan origination and Cicino's supervisor – lied in her 2024 Performance Appraisal.

162. In the Knowledge/Skill category, Krewson only rated Cicino a 4 in contrast to Stewart who – just a year earlier – had rated her as a 6 and said she "Exceeds Expectations." (Ex. C at p. 1).

163. Krewson claimed Cicino "has consistently encountered challenges, and or evidenced inconsistency, with other critical areas of the lending role, including sales activities, adhering with the same policies, processes, and procedures as her peers and colleagues, and her underwriting skills for larger and more complex loan opportunities." (*Id.*).

164. This is untrue.

165. Cicino "adhered with policies, processes, and procedures" for decades.

166. A year prior, Stewart emphasized Cicino's "detail and attention to her work" in saying she "Exceeds Expectations." (Ex. B at p. 1).

167. Stewart similarly complimented Cicino on her underwriting skills, only for Krewson to critique them shortly thereafter.

168. Had Cicino not excelled in this area, she never would have had the success she enjoyed as a commercial loan officer and been promoted to managerial roles at numerous institutions.

169. Krewson's comment that "[t]hese challenges have resulted in declining quarter production results with performance dropping from $4,885,500 in Q1 to $277,500 in Q2 and $190,000 in Q3" further proves that TruMark discriminated against Cicino based on her gender/sex and age. (*Id.*).

170. These "declining quarter[ly] production results" were directly attributable to the fact that Krewson, *inter alia*, (i) steered referrals to the younger male commercial lenders, forcing Cicino (unlike her younger male co-employees) to essentially source all her own deals,

and (ii) consistently ignored Cicino, spending no time assisting, supporting, or advocating for her deals, instead constantly doing this for her younger male colleagues.

171. The remaining negative comments in the Knowledge/Skill section of Cicino's 2024 Performance Appraisal, including that she "resisted" calling programs, are untrue as well.

172. In fact, the training for TruMark's new program to log sales activities (Monday.com) occurred on September 23, 2024, the day before Cicino returned from PTO.

173. While trying to teach herself how to use the new program – without any help from Krewson – Cicino only could figure out how to include emails (but not calls) for sales activities.

174. This, in turn, led to a significant undercounting of Cicino's sales activities.

175. Moreover, Krewson and one or more of Cicino's other younger male commercial loan officers actually used the same contact over and over again to falsely inflate their own sales activities.

176. Upon information and belief, Cicino had as many sales activities as one or more of her younger male colleagues.

177. Nonetheless, Cicino was criticized for it in her 2024 Performance Appraisal.

178. Krewson's accusation that Cicino "required multiple follow-ups" is untrue too, as are those in the ensuing Quality section where Krewson likewise gave Cicino a 4 which meant she allegedly did not meet expectations. (*Id.*).

179. Krewson's claim that Cicino lacked a "sense of urgency," *id.*, stands in stark contrast to Stewart's observation that she "understands the importance of following up quickly." (Ex. B at p. 2).

180. Cicino showed a sense of urgency and followed up quickly even when on vacation.

181. For instance, in November 2024, Cicino went on a pre-planned family vacation to Mexico.

182. Several of Cicino's colleagues emailed her words to the effect that she needed to "unplug" or "pretend you're on vacation."

183. One of Cicino's colleagues even said she was setting a "terrible example" by working so hard on her vacation and that he did not want to be bothered when he went on vacation.

184. Krewson's statement in the 2024 Performance Appraisal that "Jo [Cicino] has been given clear guidance coaching and support from peers" is also untrue. (Ex. C at p. 1).

185. In addition, Krewson disingenuously referenced "opportunities referred directly to her by her manager." (*Id.*).

186. Krewson gave most if not all these "opportunities" to his male underlings who were younger – not to Cicino.

187. In regard to Teamwork, Krewson wrote that Cicino demonstrated "unprofessional behavior on multiple occasions," a "lack of willingness to fully commit to change," and a "negativity [that] has had a detrimental effect on team morale and peer collaboration, undermining the cohesion and productivity of the department." (*Id.* at p. 2).

188. This is untrue.

189. Krewson failed to provide a single example to support these comments about Cicino's Teamwork and, just the opposite, Cicino even threw Ms. Fox a baby shower to do all she could to foster a teamwork environment.

190. In his 2023 Performance Appraisal, Stewart lauded Cicino for being "always willing to help out those on the commercial lending team as well as those in other departments

such as the Business Development Officers and Branch MSR's and the MSC." (Ex. B at p. 2).

191. The Teamwork category specifically takes into account whether a TruMark employee provides "help, advice, support, and assistance to members and colleagues performed with an attitude of professionalism, patience and kindness which benefits the other and elevates their wellbeing."

192. On Teamwork, Stewart rated Cicino "Exceeds Expectations." (*Id.*).

193. Krewson's claim that there were "several discussions regarding the importance of maintaining a positive attitude" with Ms. Cicino, Ex. C at p. 2, is untrue.

194. Krewson's negative comments about Cicino's Service and Sales ability, *id.* at pp. 2-3, are also completely at odds with those of Stewart.

195. Krewson's comments about Cicino's Sales and Service ability are untrue.

196. In this same category, Stewart said "Joanne provides excellent service to the members she is working on for commercial loans." (Ex. B at p. 2).

197. In his 2023 Performance Appraisal, Stewart went on to note that "Joanne has often followed up with borrowers in the evening or weekend due to the borrower not being available during the day. This level of service has led to several referrals and successful borrowing relationships." (*Id.*).

198. As for Sales, Krewson's accusations that Cicino "appears resistant to utilizing the sales tools and techniques essential for sustained production and performance" and "remains below minimum weekly sales call targets," Ex. C at p. 3, are falsehoods.

199. Reiterating that Cicino "is not on track to meet her Q4 sales expectations," *id.*, Krewson also again ignored that he deprived her of any meaningful opportunity to meet her Q4

sales expectations by refusing to give her referrals and not spending sufficient or equal time guiding Cicino and supporting her deals.

200. Indeed, from the very outset, Krewson made no effort to disguise his disdain for Cicino – a woman in her 60s.

201. Very shortly after returning from her trip to Mexico, having heard Krewson very much loves to travel, Cicino asked if Krewson wanted to see a few pictures of a treehouse restaurant Cicino had gone to and enjoyed.

202. Krewson's rudely responded that he had no interest in hearing anything about her vacation.

203. This, of course, stook in stark contrast to the joking and smoking Krewson engaged in behind closed doors with Cicino's younger male colleagues.

204. Krewson was so overtly hostile on this particular occasion it made Cicino sick to her stomach and she felt the need to share the episode with her sons and boyfriend.

205. Krewson, in his capacity as a TruMark supervisor, provided more commercial loan referrals to Cicino's younger male colleagues than to Cicino.

206. Krewson, in his capacity as a TruMark supervisor, spent more time guiding Cicino's younger male colleagues in helping deals go through than with Cicino.

207. Krewson, in his capacity as a TruMark supervisor, did more to support the deals being worked on by Cicino's younger male colleagues than he did with Cicino's deals.

208. Krewson, in his capacity as a TruMark supervisor, discriminated against Cicino based both on her sex/gender and age the entire time he supervised Cicino up until her firing.

**G) TruMark Fires Cicino With No Warning and HR Ignores Her Complaints**

209. Krewson concluded Cicino's 2024 Performance Appraisal by stating that "it will be recommended for FY25 Jo [Cicino] be a party to a performance improvement plan." (*Id.*).

210. TruMark did not place Cicino on a PIP.

211. TruMark did not communicate to Cicino that her job was in jeopardy.

212. On April 14, 2025, Krewson advised Cicino that she was being fired effectively immediately.

213 No one from TruMark's HR Department was present for Cicino's firing.

214. Upon information and belief, Krewson did not consult with TruMark's HR Department about firing Cicino prior to doing so.

215. TruMark did not provide Cicino with any severance.

216. TruMark terminated Cicino's medical benefits less than a month after firing her.

217. Upon information and belief, TruMark's HR Department did not investigate Cicino's allegations of an abusive and toxic workplace.

**H) Cicino Has Suffered Considerable Financial and Emotional Harm**

218. Cicino's decades long career as a commercial loan officer is effectively over.

219. Cicino has not worked as a commercial loan officer since being fired by TruMark.

220. After being fired, Cicino's confidence diminished tremendously and virtually evaporated.

221. Cicino has suffered extreme emotional distress as a result of TruMark's conduct.

222. Due to her financial difficulties, Cicino also was forced to sell her home.

**COUNT I**

**(TITLE VII: SEX DISCRIMINATION)**

223. The allegations of Paragraphs 1 through 222 are incorporated herein by reference with the same force and effect as if set forth in full below.

224. TruMark treated Cicino less favorably because of her gender/sex including with respect to branch assignments, commercially valuable referrals, sexually harassing comments, and support with her business.

225. Gender/sex was a motivating factor in these adverse actions, in violation of 42 U.S.C. § 2000e-2(a)(1).

226. TruMark did not fire Cicino for legitimate, non-discriminatory business reasons.

227. TruMark fired Cicino based on gender/sex in violation of 42 U.S.C. § 2000e-2(a)(1).

228. TruMark acted with malice and with a reckless indifference to Cicino's rights.

229. TruMark's conduct caused Cicino damages for which she seeks all remedies available under Title VII.

**COUNT II**

**(ADEA: AGE DISCRIMINATION)**

230. The allegations of Paragraphs 1 through 229 are incorporated herein by reference with the same force and effect as if set forth in full below.

231. Cicino was over 40 years old and qualified for her position.

232. TruMark treated younger employees/comparators more favorably than it treated Cicino.

233. TruMark terminated Cicino under circumstances supporting an inference of age

discrimination.

234. But for Cicino's age, TruMark would not have taken these adverse actions in violation of 29 U.S.C. § 623(a)(1).

235. In fact, TruMark subsequently fired Langlois who, like Cicino, is over 40 years old.

236. Since Krewson took over as supervisor for TruMark's commercial loan unit, upon information and belief, no commercial loan employee under the age of 40 has been fired.

237. TruMark's violations of Cicino's rights were willful.

238. TruMark's conduct caused Cicino damages for which she seeks all remedies available under the ADEA.

**COUNT III**

**(PHRA: SEX DISCRIMINATION)**

239. The allegations of Paragraphs 1 through 238 are incorporated herein by reference with the same force and effect as if set forth in full below.

240. TruMark discriminated against Cicino in the terms and conditions of employment in violation of 43 P.S. § 955.

241. Gender/sex was a motivating factor in these adverse actions.

242. TruMark terminated Cicino because of gender/sex in violation of 43 P.S. § 955 and not for legitimate, non-discriminatory business reasons.

243. TruMark acted with malice and with a reckless indifference to Cicino's rights.

244. TruMark's conduct caused Cicino damages for which she seeks all remedies available under the PHRA.

**COUNT IV**

(**PHRA: AGE DISCRIMINATION**)

245. The allegations of Paragraphs 1 through 244 are incorporated herein by reference with the same force and effect as if set forth in full below.

246. TruMark discriminated against Cicino in the terms and conditions of employment in violation of 43 P.S. § 955.

247. TruMark fired Cicino because of her age in violation of 43 P.S. § 955.

248. TruMark's violations of Cicino's rights were willful.

249. TruMark's conduct caused Cicino damages for which she seeks all remedies available under the PHRA.

**PRAYER FOR RELIEF**

WHEREFORE, Cicino requests that the Court enter a judgment in her favor and award the following relief: (a) reinstatement or front pay in lieu thereof; (b) compensatory damages for emotional distress under Title VII and the PHRA; (c) punitive damages under Title VII; (d) liquidated damages under the ADEA; (e) reasonable attorneys' fees and costs; (f) injunctive relief to prevent further violations by TruMark; and (g) such further relief as the Court deems just.

COSS & MOMJIAN, LLP

By: /s/ Christopher Coss
Christopher C. Coss (Pa. Bar No. 55558)
Thomas J. Momjian (Pa. Bar No. 65977)
Two Bala Plaza, Suite 300
Bala Cynwyd, PA 19004
Telephone: (610) 667-6800
Facsimile: (610) 667-8174

*Attorneys for Plaintiff Joanne Cicino*

Dated: October 30, 2026